**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JILLIAN NOVOSEL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No.  21 C 3080 |
| | ) | |
| AZCON INC. RETIREMENT and | ) | Judge Rebecca R. Pallmeyer |
| BENEFITS COMMITTEE, as Plan | ) | |
| Administrator of the Azcon, Inc. | ) | |
| Employee Stock Ownership Plan, and | ) | |
| AZCON, INC., d/b/a Azcon Metals, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Jillian Novosel worked for Azcon, Inc. ("Azcon") for nearly sixteen years.  When she retired in 2015, Novosel sought to cash out her holdings in Azcon's Employee Stock Ownership Plan ("ESOP").  In this lawsuit, Novosel alleges that Azcon's Retirement and Benefits Committee ("Committee"), as administrator of the ESOP, miscalculated her share value and distributed $50,000 less than she was owed.  Claim 1 of Novosel's Complaint [1] seeks recovery of the withheld benefits.  In Claim 2, she alleges that the Committee amended the plan in violation of the Employee Retirement Income Security Act of 1974, reducing her accrued benefits.  Finally, in Claim 3, Novosel alleges that Azcon and the Committee breached a settlement agreement it previously reached with her.  Defendants filed a Motion to Dismiss [13].  For the reasons stated herein, Defendants' Motion is granted in part and denied in part.  The court dismisses Novosel's first two claims, but her breach of contract claim survives this motion.

## BACKGROUND

Plaintiff Jillian Novosel began working as an employee for Defendant Azcon on or about October 11, 1999.  (Compl. [1] ¶ 8.)  Azcon processes scrap metal and provides steel mills, foundries, rerolling mills, and other customers with melting scrap and other materials.  (*Id.* ¶ 7.)  As a benefit of her employment, Novosel participated in Azcon's ESOP.  (Compl. ¶ 9.)  The plan,

which has an "Effective Date" of May 13, 2013, governs, among other things, how the Committee values shares of stock when making employee distributions. (2013 Employee Stock Ownership Plan, Ex. 3 to Compl. (hereinafter "2013 Plan") [1-3][1] § 1.1.) On or about August 7, 2015, Novosel took an early retirement from Azcon, "relying upon the balance in her ESOP account, which showed nearly $400,000 in assets." (Compl. ¶ 10.) On or about November 13, 2015, Novosel learned she was eligible to "diversify" 50 percent of her shares, or 72.7673 shares, at a price she understood to be $1,840 per share.[2] (Id. ¶ 11.) After Novosel sought to diversify, she received a letter from Richard Secrist, a member of the Committee, in which he allegedly explained that due to a "mid-year evaluation," the price per share in the ESOP was actually only $165. (Id. ¶¶ 12, 20.)

Novosel filed administrative claims against Defendants, contesting the reduction in price for the shares she had elected to diversify. (Id. ¶ 13.) The parties agreed to settle those claims in a written settlement agreement on November 17, 2017. (Id. ¶ 14; Settlement Agreement, Ex. 1 to Compl. (hereinafter "Settlement") [1-1] at 4-6.) The settlement was entered into between Novosel on one side, and Azcon, the Committee, and the Plan (referred to collectively as "Azcon") on the other. (Settlement at 1.) In the settlement, Novosel agreed to rescind her diversification election and agreed, further, that she would "have no further diversification rights under the Plan." (Id.) To rescind the diversification election, Azcon agreed to return the 72.7673 shares to Novosel's account, and Novosel agreed to repay to Azcon the $12,006.60 (i.e. $165 per share)

---

[1]     The Exhibits attached to Novosel's Complaint are not entered on the docket as separate entries. Rather, Exhibit 1 [1-1] begins at page 10 of the Complaint, Exhibit 2 [1-2] at page 16, Exhibit 3 [1-3] at page 17, and Exhibit 4 [1-4] at page 67. Because these exhibits were attached to the Complaint, the court considers them "[i]n addition to the allegations set forth in the Complaint itself." *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 621 (7th Cir. 2020); Fed. R. Civ. P. 10(c).

[2]     Novosel does not explain the meaning of "diversify" in this context, but Section 7.13 of the 2013 Plan explains that "diversification will be accomplished with a distribution of stock to the Participant, which must be put to the Company, with the proceeds transferred to [a savings plan] or paid in cash." (2013 Plan § 7.13.) In practical terms, it appears to the court that Novosel expected Defendants to buy back 72.7673 of her shares at $1,840 per share, or $133,891.83.

she had received as payment. (*Id.* at 2.) The settlement did not require the $12,006.60, or "Repayment Amount," to be returned to Azcon immediately. Instead, the parties agreed that Novosel would retain that amount as a no-interest loan, eventually repaying Azcon by way of deduction from the "distribution of the shares of Company stock held in her Plan account." (*Id.*) The settlement also included the following term:

> Unless the Committee exercises its discretion to allow for an earlier distribution, Novosel may elect to begin receiving a distribution of the shares of Company stock held in her account upon attaining the Plan's Normal Retirement Age of 65. Although she will attain that age in August of 2018, the first distribution would be made in 2019, pursuant to the terms of the Plan. At the time of this first distribution, Azcon will purchase the distributed shares from Novosel at their December 31, 2018 appraised value, minus the Repayment Amount set out in Paragraph 1(d). If the value of the shares distributed in 2019 is less than the Repayment Amount, the remainder of the Repayment Amount will be applied to reduce the amount paid by the Company to purchase subsequent distributions of Company stock.

(*Id.*)

In accordance with the terms of the Settlement Agreement, Novosel received her first distribution from the ESOP in 2019, the year after she reached age 65. (Compl. ¶ 16.) As directed by the settlement, the price per share for this distribution was based on the December 31, 2018 appraised value. (*Id.*) (Neither that price nor the total value of the distribution is set forth in the Complaint.)

Novosel alleges that "[t]hrough the Settlement Agreement, the Parties agreed Novosel would receive her distribution in two lump sums," and that the second payment would be made based on "the valuation of the ESOP as of December 31, 2019." (*Id.* ¶ 17.) The Settlement Agreement, however, does not state those terms. Instead, it refers to a "first distribution" to be made in 2019 based on the December 31, 2018 appraised value. (Settlement at 2.) And recognizing that the contemplated 2019 distribution might not fully satisfy Novosel's $12,006.60 loan obligation (the amount she agreed to repay from the diversification event), the Agreement states that "the remainder of the Repayment Amount will be applied to reduce the amount paid by the Company to purchase *subsequent distributions* of Company stock." (*Id.* (emphasis

added).)  That the Agreement contemplates more than one subsequent distribution suggests, if anything, that Novosel might well receive more than two total distributions.  In any event, it does not specify the payment of two lump sums.

The Agreement also does not state that a subsequent distribution would be based on the December 31, 2019 appraised value.  Instead, the Agreement was silent as to the valuation for any distributions after 2019.  Without otherwise identifying the source of her expectation, Novosel alleges that she understood her second payment would be based on a December 31, 2019 valuation, which turned out to be $1,055.60 per share, for a total of $114,409.10.  (Compl. ¶ 17.)  But on August 3, 2020, Novosel "received Notification that Azcon had undertaken an additional 'interim' valuation, and the value per share attributable to Novosel's ESOP account would be valued at $561.21 per share."[3]  (*Id.* ¶ 18; Azcon Aug. 3, 2020 Letter to Shareholders, Ex. 2 to Compl. (hereinafter "Azcon Letter") [1-2] at 1.)  Louis J. Mantia, Jr.—Azcon's Treasurer and Secretary—explained in a letter to ESOP shareholders that the COVID-19 pandemic "had a significant financial impact on [its] business," and that Azcon therefore decided to direct the ESOP trustee to hire an "independent valuation firm" who would "consider[ ] the economy, market conditions, the company's performance and the company's performance compared to others in the industry."[4]  (Azcon Letter at 1.)  The letter continued:

> Due to the effect of COVID-19 on our business, our stock value decreased 45%, from $1,055.60/share on December 31, 2019 to $561.50/share on April 30, 2020. *THE UPDATED VALUE OF $561.50/SHARE WILL BE USED TO PAY ANY DISTRIBUTION OR DIVERSIFICATION REQUESTS THIS YEAR.*

---

[3]      The court notes that while Novosel used quotation marks around the word "interim," Azcon did not use that word in its August 3, 2020 letter.

[4]      Though not ultimately relevant to resolving this motion, the court notes that, as Defendants observe, allowing some plan participants to withdraw shares at an inflated value that no longer reflects the actual state of the company harms all other plan participants, in potential contravention of the Committee's fiduciary duty to treat all plan participants fairly.  (*See* Mem. in Supp. of Mot. to Dismiss [14] at 2.)

(*Id.*)  Novosel received $561.21[5] per share, or $60,824, as her second distribution; she does not specify the date of this distribution, but the court presumes it post-dated the April 30, 2020 valuation date.  (Compl. ¶ 18.)

A final piece of background information that is relevant to this case is Defendants' revision of certain sections of the 2013 Plan.  Effective January 1, 2017—after Novosel's 2015 attempt to diversify several shares, but before the date of the Settlement Agreement—Azcon "restate[d] the Plan in its entirety" ("2017 Plan").[6]  (2017 Employee Stock Ownership Plan, Ex. 4 to Compl. (hereinafter "2017 Plan") [1-4] at 5.)  The relevant provisions of the 2017 Plan are identical to those in the 2013 Plan.[7]  Section 7.4 states that distributions will be made in a single "lump sum" or "in annual installments over a term of up to 5 years."  (2013 Plan § 7.4; 2017 Plan § 7.4.)  It also states that "a Participant's Account balances will be determined as of the regular Accounting Date coincident with or immediately preceding the date of distribution of the Participant's Accounts."  (2013 Plan § 7.4; 2017 Plan § 7.4.)  Under the caption "Accounting Dates," Section 1.5 defines the term "Accounting Date" as "the last day of each Plan Year and an Accounting Date occurring under subsection 12.4 and an Accounting Date as may be determined by the Committee in a uniform and nondiscriminatory manner."  (2013 Plan § 1.5; 2017 Plan § 1.5.)

Novosel brings three claims for relief.  First, she claims the Committee violated the Employee Retirement Income Security Act of 1974 ("ERISA") by not providing her the actual sum

---

[5]   The parties do not discuss or explain why Novosel received $561.21 per share instead of $561.50 per share.

[6]   Novosel generally alleges that the 2013 Plan applies to her allegations, though she argues in the alternative (as Claim 2) that the 2017 Plan constituted an unlawful cutback of her accrued benefits, in violation of ERISA § 204(g).  As explained below, the court agrees with Azcon that relevant provisions in the two plans are identical, and thus the issue of which plan applies to Novosel's claims is immaterial.

[7]   In addition to the provisions discussed here, Defendants also point out that Section 7.5—"Timing of Distributions"—is identical in both plans.

of benefits due to her under the plan when it made a 2020 distribution according to the April 30, 2020 valuation. (Compl. ¶¶ 19-26; 29 U.S.C. § 1132.) Second, she claims the Committee violated ERISA by amending the benefit plan in such a way as to decrease her accrued benefit. (Compl. ¶¶ 27-34; 29 U.S.C. § 1054(g).) Third, she claims Defendants breached the terms of the Settlement Agreement when they made the 2020 distribution. (Compl. ¶¶ 35-41.) Defendants seek to dismiss all three claims. (*See* Mem. in Supp. of Mot. to Dismiss (hereinafter "Mem. in Supp.") [14].)

## DISCUSSION

A Rule 12(b)(6) motion to dismiss challenges the sufficiency of a complaint. *See* FED. R. CIV. P. 12(b)(6); FED. R. CIV. P. 8(a)(2). A complaint must "sufficiently give to the defendants 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell v. City of Country Club Hills*, 841 F.3d 713, 716 (7th Cir. 2016) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court accepts the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor, but it need not do the same for legal conclusions or "threadbare recitals" supported by only "conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## I.    ERISA: Withholding Benefits Due Under the Plan

In her first claim for relief, Novosel alleges that she was "entitled to distribution of her account based on the 2019 valuation at $1,055.60 per share for 108.373 shares." (Compl. ¶ 25.) She further alleges that "[t]he Committee violated ERISA and the 2013 Plan in failing to distribute the proper amount, and instead distributing $561.20 per share. $60,824 was placed in Novosel's Principal account, leaving $53,585 due Novosel." (*Id.* ¶ 26.) Defendants seek to dismiss this claim on the grounds that Novosel failed to allege the plan was administered in an arbitrary and capricious manner and, separately, that Novosel failed to allege she exhausted administrative remedies. (Mem. in Supp. at 6-9.)

6

Generally, "a plan fiduciary must 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries.'" *Boggs v. Boggs*, 520 U.S. 833, 845 (1997) (quoting 29 U.S.C. § 1104(a)(1)). In distributing plan benefits, the administrator has a duty to adhere to the provisions in the plan documents. *See Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 286 (2009). Where "discretion is clear from the language of the plan," the court "will set aside an administrator's decision only if it is arbitrary and capricious." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 743 (7th Cir. 2009). This is a deferential standard of review, though the court does not "rubber stamp" decisions where there is an absence of reasoning in the record to support them. *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010).

As discussed above, both the 2013 Plan and 2017 Plan value distributions according to an Accounting Date, defined in both plans as "the last day of each Plan Year *and* an Accounting Date occurring under subsection 12.4 *and* an Accounting Date as may be determined by the Committee in a uniform and nondiscriminatory manner." (2013 Plan § 1.5 (emphasis added); 2017 Plan § 1.5 (emphasis added).) The parties have offered competing interpretations of this oddly-worded provision. Novosel argues that, since Section 12.4 "applies only to termination or partial termination of the Plan," which "does not apply in this case," then Section 1.5 of "the Plan clearly mandates that the Accounting Date is the last day of each Plan Year as alleged in the Complaint, December 31, 2019." (Resp. [18] at 4.) By omitting any mention of the third part of Section 1.5—a date "determined by the Committee"—Novosel seems to imply (without explanation) that it, too, does not apply in this case.

The plan's definition of "Accounting Dates" is not a model of clarity.[8] The confusing use of the word "and" (the Committee appears to mean "or") might, in some instances, require denial of a motion to dismiss. Here, however, that result would be appropriate only if the court could,

---

[8] Here, for example, is a clearer statement of the drafters' apparent intent: The term "Accounting Date" in this Plan refers to one or more of the following dates: (1) the last day of each Plan Year; (2) the date the Plan is terminated or partially terminated, as directed by Section 12.4; (3) a date determined by the Committee in a uniform and nondiscriminatory manner.

resolving any dispute in Novosel's favor, read the Plan's language in a way that supports her claim. Novosel herself offers no explanation for how to do so, and the court has not come up with a way on its own.

At the risk of doing Novosel's work for her, the court notes that she could, perhaps, have argued that the "uniform and nondiscriminatory" language merely cabins Defendants' discretion under the first two definitions of "Accounting Date." The first problem with this theory is that the link between the first two definitions is the same as the link between the second and the third. While the plan's use of the word "and" is potentially confusing, Novosel herself appears to acknowledge that the word permits a second Accounting Date upon termination of the plan under Section 12.4. (Resp. at 4.) As that same word is used to add the third definition of "Accounting Date," it follows that the plan permits a third set of dates. The second problem with this potential argument is that only the third definition of Accounting Date—a date "as may be determined by the Committee"—involves discretion that might be cabined by the "uniform and nondiscriminatory" requirement. The last day of each Plan Year is a recurring date (December 31) that involves no choice or discretion by the Committee. The date of termination is determined according to specific provisions in Section 12.2. Once the plan terminates according to that section, the Accounting Date under Section 1.5 is limited to a single day: the day of termination. Thus, it is not clear how the first two definitions of "Accounting Dates" under Section 1.5 would be affected by the additional requirement that the Committee select a date in a "uniform and nondiscriminatory manner."

Perhaps instead Novosel could have argued that the Committee's power to select any date, under the third definition of Section 1.5, renders unnecessary the first two definitions. It appears to the court, however, that the first two definitions serve a purpose notwithstanding the inclusion of the third definition. While the third definition suggests the Committee *could*, on its own accord, select the last day of a Plan Year or the date of termination, it does not *require* as much. The first two definitions, then, serve the purpose of assuring plan participants that their

8

shares will be revalued at a regular interval and again if the plan terminates.[9]

Notably, Novosel does not alternatively allege or argue that Defendants' decision to use the April 30, 2020 Accounting Date for her 2020 distribution was arbitrary and capricious.[10] The letter from Azcon's Treasurer and Secretary informed company shareholders that, due to the effects of the COVID-19 pandemic, the Committee would be using the April 30, 2020 Accounting Date—in which it valued shares at $561.50—for distributions going forward. (Azcon Letter at 1.) Novosel might have alleged that the Committee—though able to select an alternative date under Section 1.5—acted arbitrarily and capriciously when it selected April 30. But she has not done so.

Finally, as Defendants note, Section 11.1(f) in both plans gives the Committee "[c]omplete discretion to interpret and construe the provisions of the Plan." (2013 Plan § 11.1; 2017 Plan § 11.1.) Novosel contends this language is irrelevant because "[h]ere, there is *nothing* to construe and interpret as the specific terms of the 2013 Plan require the Accounting Date to be December 31, 2019, and for distributions to be in accord with the amounts determined on that date." (Resp. at 4.) To the contrary, the court recognizes that Section 1.5 could have been drafted in a more straightforward way (see footnote 8 *supra*), but even as currently written, that section does provide the Committee with the ability to select another date.

In addition to arguing that they have complied with plan provisions, Defendants suggest the court should dismiss Novosel's claim due to a pleading deficiency: that she has not alleged

---

[9]     Yet another potential argument for Novosel could be that certain revisions found in the 2017 Plan, which clearly and explicitly endorsed the ability of the Committee to select a valuation date other than December 31, can be interpreted as implicitly admitting the Committee lacked such power under the 2013 Plan. Novosel makes a version of this argument in her second claim, considered below, and the court explains there why this argument is unavailing.

[10]     After Azcon pointed this out, Novosel responded that "[t]here are no magic words that must be used in the Complaint." (Resp. at 3 (citations omitted).) While true, the problem for Novosel is not that she failed to explicitly state the words "arbitrary and capricious," but rather that she failed to allege facts that show Azcon's actions were arbitrary and capricious.

that she exhausted administrative remedies. Defendants are correct that plaintiffs must ordinarily exhaust administrative remedies before filing an ERISA suit. *See, e.g., Zhou v. Guardian Life Ins. Co. of Am.*, 295 F.3d 677, 679 (7th Cir. 2002) ("As a pre-requisite to filing suit, an ERISA plaintiff must exhaust his internal administrative remedies."); *see also Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 873 (7th Cir. 1997) ("[T]he plaintiff, as a matter of the federal common law of ERISA, would be required to exhaust his ERISA-required internal remedies . . . before being allowed to sue."). The exhaustion prerequisite "furthers the 'goals of minimizing the number of frivolous lawsuits' and enables the preparation of a more complete factual record for judicial review." *Zhou*, 295 F.3d at 679 (quoting *Gallegos v. Mt. Sinai Med. Ctr.*, 210 F.3d 804, 807-08 (7th Cir. 2000)).

Defendants do not argue that Novosel failed to exhaust administrative remedies, however. They merely argue that Novosel failed to plead that she did. But exhaustion of remedies is not an element of a claim under ERISA; instead, failure to exhaust is an affirmative defense. *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 922 (7th Cir. 2007) ("A plaintiff's failure to exhaust administrative remedies is an affirmative defense, which is the defendant's burden to prove."). Moreover, the current record suggests Defendants would not succeed in meeting their burden on this issue: Novosel attached to her Response Memorandum two letters from Defendants, in which Defendants informed Novosel that her internal claim and appeal had been denied. In their Reply, Defendants admit that the letters are "apparent evidence of [Novosel's] pursuit of such administrative remedies," but argue that "reliance on such exhibits to her response, as opposed to specific allegations in her Complaint, is unavailing." (Reply [16] at 2.) As noted, that argument misunderstands the law; exhaustion is not a pleading requirement. If Claim 1 otherwise survived this motion, the court would not dismiss it on this basis.

## II.     ERISA: Amending Plan to Decrease Accrued Benefit

In her second claim, Novosel alleges that the Committee violated Section 204 of ERISA, 29 U.S.C. § 1054(g), by amending the plan in such a way as to reduce her accrued benefit. As

she sees things, "[t]he 'interim valuation' ordered and accepted by the Committee reduced Novosel's accrued benefit, that is the value of her shares as of the 2019 Accounting Date at the end of the Plan Year, and that is $1,055.60 per share." (Compl. ¶ 34.) Novosel contends the "interim valuation" operated as a "Decrease of Accrued Benefits Through Amendment of Plan," which is prohibited by ERISA § 204(g). 29 U.S.C. § 1054(g). Defendants argue in response that Novosel failed to allege her plan was ever amended, and thus she did not state a claim under § 204(g) of ERISA. (Mem. in Supp. at 10-11.)

Section 204(g), which bars amendments that decrease a participant's accrued benefit, governs situations involving an actual amendment to a plan; in this Circuit, that section is not triggered where the administrator is "merely carrying-out the provisions of the plan." *Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1451 (7th Cir. 1986). *But cf. Johnston v. Dow Emps.' Pension Plan*, 703 Fed. App'x 397, 407 (6th Cir. 2017) (citing *Dooley*, 797 F.2d at 1451-53) ("There is a circuit split on what constitutes an 'amendment' under ERISA § 204(g)'s anti-cutback rule . . . some courts, including ours, subscribe to a broad interpretation of 'amendment.'"). Thus, to state a claim under § 204(g) here, Novosel must allege that Defendants amended her plan.

In her Complaint, Novosel alleges that Defendants' "interim valuation" violated § 204(g). (Compl. ¶ 34.) But the April 30, 2020 valuation was not an amendment. As discussed, Section 1.5 of both the 2013 and 2017 plans states that "an Accounting Date . . . may be determined by the Committee in a uniform and nondiscriminatory manner." (2013 Plan § 1.5; 2017 Plan § 1.5.) Thus, Azcon was simply carrying out one of the plan's provisions. Reassessing the value of a plan's shares—where that process is explicitly contemplated and authorized by the plan—is not an amendment. *Cf. Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*, 241 F.3d 609, 612 (7th Cir. 2001) (citing *Dooley*, 797 F.2d at 1452) ("[Plaintiff's] argument that . . . the plan is amended every time the administrator recalculates entitlements on the basis of [interest rate] changes is frivolous.").

In support of her theory, Novosel characterizes the 2017 Plan as an amendment to the 2013 Plan and therefore a proper predicate for her § 204(g) claim. (Resp. at 6-10.) To advance this argument Novosel would need to allege that the 2017 Plan actually resulted in a change to a relevant provision. She argues such a change occurred in Section 7.13 of the 2017 Plan, which added language about "interim valuation" that did not appear in Section 7.13 of the 2013 Plan.[11] (*Id.*)

Section 7.13, however, does not directly apply to Novosel's claim. That section (in both plans) governs "Pre-Retirement Diversification Rights." (2013 Plan § 7.13; 2017 Plan § 7.13.) Novosel's claim in this case concerns *post*-retirement *distribution* rights. The Settlement Agreement—which was signed prior to the events in Novosel's allegations, discussed subsequent "distributions," and stated that Novosel "shall have no further diversification rights under the Plan"—reinforces this conclusion. (Settlement at 1.) Thus, any changes to Section 7.13 have, at most, indirect relevance to Novosel's claim.

Novosel here simply contends that "Section 7.13, within the 2017 Plan, was the Section utilized by the Committee to perform an interim valuation." (Resp. at 10.) A potentially more effective construction of this argument would be that in amending Section 7.13, the Committee implicitly acknowledged that language of the 2013 Plan did not authorize selection of any Accounting Date other than December 31, 2019. The 2017 Plan added the following text to Section 7.13:

> Generally, the value of the shares subject to diversification shall be based on the valuation made by the Trustee (pursuant to Section 5.6) on the annual Accounting Date immediately preceding the first day of the Annual Election Period. However, if at any time prior to distribution of the stock that Qualified Participants have elected to diversify, the Committee determines that the valuation as of the immediately preceding annual Accounting Date no longer reflects the fair market value of the Company Stock (such that a distribution based on the value as of such

---

[11] Azcon points out that Novosel did not mention Section 7.13 in her Complaint. (Reply [16] at 5.) While that is true, Novosel did use the phrase "interim valuation" in her Complaint, and that phrase is found in Section 7.13. The court need not comment further on this matter because, as discussed further here, Section 7.13 in the 2017 Plan did not involve an amendment that decreased Novosel's accrued benefits.

annual Accounting Date would be unfair to either or both of the Qualified Participants making the diversification election or the remaining Plan Participants), the Committee may, pursuant to Section 1.5, declare an "interim" Accounting Date, and may direct the Trustee to determine the fair market value of the Company Stock as of that date, in which case the Annual Election Period shall not end until 30 days after the results of such updated valuation are communicated to Qualified Participants.

(2017 Plan § 7.13.) This provision states that valuation is "[g]enerally" based on "the annual Accounting Date," which the court understands to be a reference to the first definition of Section 1.5 ("the last day of each Plan Year"). Section 7.13 then states an exception: "the Committee may, pursuant to Section 1.5, declare an 'interim' Accounting Date." Novosel might have argued that "interim" valuations were not authorized before this addition to Section 7.13 (the word "interim" does not appear anywhere in the 2013 Plan), and that this provision amended not just Section 7.13, but—by implication—the scope of Section 1.5.

This language in the 2017 Plan does effectively clarify the distinction between the first and third definitions of "Accounting Dates" in Section 7.13. The "annual Accounting Date" appears to be a reference to the share valuation that occurs on the last day of December every year. Since the first definition of "Accounting Date" in Section 1.5 is an annually occurring one, one could describe any date chosen under the third definition—those "as may be determined by the Committee in a uniform and nondiscriminatory manner"—as "interim" (meaning that the date fell between December 31 of the preceding year and December 31 of the current year). Indeed, Section 7.13 states that "interim" valuations are made *pursuant to Section 1.5*. If Section 7.13 were amending—rather than describing—Section 1.5, one might expect the Committee to have also amended the text of Section 1.5, such as by adding the word "interim" there as well.

In any event, Novosel has alleged that Defendants relied on the amended text of Section 7.13 ("Pre-Retirement Diversification Rights") to select a new Accounting Date, and in doing so unlawfully reduced her accrued benefit. Defendants' August 3, 2020 letter, however, never uses the word "interim," and by its terms the letter, which was directed to all Plan participants, applied not just to diversification requests but also to distribution requests. (Azcon

13

Letter at 1.)  The Settlement Agreement Novosel signed makes clear that the payment from Defendants to Novosel at issue here is a *distribution*.  (Settlement at 1-2.)  As such, the payment was governed by Section 7.4, not Section 7.13.  The court cannot conclude that Novosel has stated a claim under ERISA § 204(g).

## III.      Breach of the Settlement Agreement

In her third claim for relief, Novosel alleges that "[u]nder the terms of the Settlement Agreement, the first distribution was to be made to Novosel based on the purchase of her shares as of the December 31, 2018 value."  (Compl. ¶ 38.)  "It follows then," Novosel continued, "the second distribution would be made based on the purchase of her shares at the December 31, 2019 value.  In fact, the Settlement Agreement identified 'shares distributed in 2019' and makes no provision for an interim valuation date or any shares being distributed or valued in 2020."  (*Id.* ¶ 39.)  Thus, Novosel alleges, the failure to use December 31, 2019 as her valuation date was "a breach of the terms of the Settlement Agreement."  (*Id.* ¶ 40.)

To state a breach of contract claim, Novosel must allege: "(1) the existence of a valid and enforceable contractual promise, (2) a breach of that promise, (3) plaintiff performed his contractual obligations, and (4) resultant damages."  *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 858 (7th Cir. 2019).  Defendants argue two of these pleading requirements have not been met: first, Novosel has not identified a contractual promise by Defendants in the Settlement Agreement to value the shares in her second distribution as of December 31, 2019; second, Novosel has not alleged that she performed her own contractual obligations.  (Mem. in Supp. at 11-12.)

Defendants note that "[t]he Settlement Agreement does not contain any term requiring Defendants to distribute any payments to Novosel in 2020 based on a certain valuation or valuation date."  (*Id.* at 12.)  As discussed above, the court agrees that the settlement is silent as to the valuation date for distributions after 2019—but silence does not necessarily mean there is

14

no contractual promise. In considering Illinois contract law,[12] the Seventh Circuit held that "[w]hile a court cannot add terms to a contract, 'silence creates ambiguity . . . only when the silence involves a matter naturally within the scope of the contract as written.'" *Hongbo Han v. United Cont'l Holdings, Inc.*, 762 F.3d 598, 601 (7th Cir. 2014) (quoting *Consol. Bearings Co. v. Ehret-Krohn Corp.*, 913 F.2d 1224, 1233 (7th Cir. 1990)). The settlement refers to both the "first distribution" and "subsequent distributions." (Settlement at 2.) The first distribution has a specified valuation date; the valuation date for the second distribution is thus "a matter naturally within the scope of the contract." *Hongbo Han*, 762 F.3d at 601; *see id.* (finding a contract ambiguous because it was "silent on the method" the defendant "will use to calculate" a benefit for plaintiff).

Defendants may ultimately prevail on their argument that the Settlement Agreement's "specific valuation date for the 2019 payment" suggests that the "absence of a requirement" for future payments means the valuation for those payments is not similarly required to be based on a specific date. (Mem. in Supp. at 12.) But as Defendants are the moving parties seeking dismissal, the court draws reasonable inferences in Novosel's favor. Her allegation that the parties agreed subsequent distributions would follow the pattern established by the first distribution is a reasonable interpretation of an ambiguous contract.

Defendants' second argument is that Novosel "fail[ed] to allege that she performed her contractual duties." (*See* Mem. in Supp. at 12.) Specifically, Defendants argue that "[w]hile Novosel asserts that she agreed to repay the reduced amount originally received from the Defendants, she never alleges that she actually did repay the reduced amount to the Defendants." (*Id.* (internal quotation marks omitted) (citing *Hoopla Sports and Entm't, Inc. v. Nike, Inc.*, 947 F. Supp. 347, 357 (N.D. Ill. 1996)).) Like the argument about failure to plead exhaustion, this argument about a purported pleading failure has no merit. The Settlement Agreement states that

---

[12] The settlement states that the "Agreement shall be interpreted according to the laws of the State of Illinois." (Settlement at 4.)

*Defendants* will reduce their distributions to Novosel by the "Repayment Amount" as a means of collecting on that loan. (Settlement at 2.) Thus, it is within Defendants' means to satisfy Novosel's obligation under the contract. In any event, Novosel alleges that the first distribution from Defendants "was properly paid in 2019." (Compl. ¶ 16.) Since the first distribution was "proper," the court draws the reasonable inference that Azcon deducted the amount Novosel owed, and thus Novosel met her obligation under the contract.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [13] is granted as to Novosel's first two claims and denied as to her third claim. Novosel has leave to file an amended complaint within 21 days.

ENTER:

Dated: March 7, 2022

REBECCA R. PALLMEYER
United States District Judge